**Richard BLACK, aka Del Black, Sunshine Realty and its Licensed Real Estate Broker Sue Mallot, Appellants,**

v.

**Frank DAHL, Appellee.**

**No. 4770.**

Supreme Court of Alaska.

March 27, 1981.

---

Albert Maffei, Maffei, Inc., Anchorage, for appellants.

John Reese and Virginia Bonnie Lembo, Law Office of John Reese, Anchorage, for appellee.

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and DIMOND, Senior Justice.

## OPINION

BURKE, Justice.

This appeal arises from a judgment against a real estate salesman, Richard D. (Del) Black, and the broker that employed him, Sue Mallot of Sunshine Realty, for breach of the fiduciary duty owed to their client, Frank Dahl.

Dahl sued Black and Mallot as a consequence of Dahl's attempt to utilize Black's services to sell his leasehold interest in Illiamna Lake Lodge.[1] In 1975, the lodge was losing money. As a result Dahl fell behind in his lease payments to his lessor, Richard Sjoden. In early January, 1976, Dahl decided to sell his leasehold interest, plus improvements, for $50,000 rather than lose his entire investment. In the second week of January, 1976, Dahl contacted Black, with whom he had previous dealings, explained that he was in danger of losing "his position" if he was unable to sell his lease rights, and asked if Black was aware of any potential buyers. Black replied that he believed he could locate willing buyers and stated he would begin working on it. The two entered an oral agreement which provided a 10% commission for Black should he locate a buyer.

Black conferred with Dahl almost daily during the following weeks and revealed

[1]. Dahl had more than four years remaining on a five year lease with two five year options to renew.

that he had two potential buyers, Prichard and Sears, who were interested in purchasing the leasehold as partners. During this time Black also contacted D. E. Patton of Alaska Marketing and Management, who occasionally represented Sjoden, Dahl's lessor, and obtained from Patton a ten-day extension on the default deadline from January 31, 1976 to February 10, 1976. In addition Black consulted Sjoden's attorney in order to confirm the lease termination date.

Dahl did not look for other buyers once the agreement with Black had been reached, and as the February 10th deadline for default approached, Dahl became increasingly concerned that the deal with Sears and Prichard would not be completed in time to avoid default. Black repeatedly assured Dahl, however, that the partnership intended to go through with the purchase of his interest. Just prior to the deadline, in fact, Dahl was informed by Black that there was no need to worry, that the partners intended to purchase, and that Patton, Sjoden's representative, was aware of the deal and was pleased with it.

In fact, the partners were not prepared to close the deal at that time. Prichard and Sears had asked to see the financial records of the lodge, but Black never requested them from Dahl and provided instead only a "pro forma statement" concerning future profits. The partners also wished to inspect the property before purchasing it, but Black made no effort to facilitate such an inspection, nor did he inform Dahl of the necessity of a physical inspection. Moreover, according to Sears, one of the partners, Black had informed him that if the partners delayed ten to fifteen days they would be able to acquire the leasehold for $10,000 less than the $50,000 Dahl required.

When the default deadline passed, Dahl called Black to ask if he was aware of that fact and Black replied that he was. When asked why the deal had not closed as had been assured, Black said only that he

"guess[ed] they decided they weren't interested in buying a lodge." Dahl later learned that Sears and Prichard had, in fact, bought the leasehold interest.

Black testified that the prospect of another sale was initially raised by Patton, some time after February 10, 1976. Black further testified that Sears and Prichard were aware that the new price of $40,000 excluded some $10,000 worth of Dahl's personal property.

This testimony was contradicted by that of Sears, which was given at a deposition and later admitted into evidence. According to Sears, the partners delayed closing the deal specifically in order to obtain the lower price promised them by Black, but were not told this lower price would mean the loss of the leasehold improvements which represented Dahl's personal property. Sears further testified that although the partners were under the impression they were purchasing an existing lease, the document presented with the lease agreement at the closing of the deal was a promissory note for management and consulting fees payable to Alaska Marketing and Management (Patton's company). This note recited a $40,000 fee, with a $10,000 down payment, the remainder to be paid in installments.[2]

 Upon learning of the subsequent sale Dahl filed suit against both Black and his broker, Mallot. The complaint alleged that Black had willfully or negligently failed to inform Dahl of any conflict of interest, failed to insure that the proceeds of the sale would accrue to Dahl, and delayed the closing of the original deal, all of which constituted a breach of the fiduciary duty owed by Black to Dahl. Dahl also alleged that Mallot, as Black's broker, was legally responsible for damages arising from a breach of fiduciary duty by her salesman, Black.[3]

At trial, Black and Mallot maintained that in the absence of a written listing agreement the fiduciary duty owed by real estate agent and broker to client did not arise, although Black admitted some duty of "professional loyalty" was owed to Dahl. Black evidenced some confusion as to who he was representing, variously testifying that he had been representing Sjoden, as co-broker with Patton, that he represented Sears and Prichard, and on deposition that he was unsure just who he had been representing.

In Black's view, the primary reason the initial deal did not close was that weather conditions prevented the partners from inspecting the property prior to the February 10 deadline. Black also maintained he had made every effort in Dahl's behalf that could be made. The trial court disagreed and found that Black owed a fiduciary duty to Dahl and breached that duty. Dahl was awarded slightly over $30,000 in compensatory damages and $10,000 in punitive damages. Appellants now claim error in the court's decision on several grounds.

I

Appellants initially disputed the lower court's finding that an agreement existed between Black and Dahl and argued that admission of evidence of an oral agreement violated both AS 08.88.341,[4] which requires all real estate listings to be in writing, and AS 09.25.010(a)(8),[5] the Statute of Frauds.

---

2. Patton received a $2,000 commission and Sunshine Realty received a $2,000 commission, of which Black retained $1,000.

3. If Black is liable, then Mallot's liability is established by the doctrine of respondeat superior. Under Alaska's statutory system governing real estate brokers and salesmen, a salesman is an employee of the broker. AS 08.88.-171(c); *Calvo v. Calhoon*, 559 P.2d 111, 113–14 (Alaska 1977). *See also White v. Brock*, 584 P.2d 1224, 1227–28 (Colo.App.1978).

4. AS 08.88.341 provides: "*Listings.* All real estate listings must be in writing and must be signed by the seller or by an agent of the seller. All exclusive listings must have a definite expiration date."

5. AS 09.25.010(a)(8) provides:

 *Statute of frauds.* (a) In the following cases and under the following conditions an agreement, promise, or undertaking is unenforceable unless it or some note or memorandum of it is in writing and subscribed by the party or by his agent:

Appellants now concede, however, that although a real estate agent cannot enforce such an agreement,[6] a client can.[7]

Appellants further concede that had a written listing been entered into, real estate agent Black would have owed "a high degree of fidelity to the principal" and would have been under a duty to "exercise that degree of care and skill ordinarily employed by persons of common capacity." In the absence of a listing, however, it is appellants' position that a lesser duty is owed, which is:

> no more than to use reasonable efforts to find a purchaser for the leasehold interest, to disclose all pertinent facts to the principal and not to engage in any fraud, or deceit, or misrepresentation.

We disagree.

In *Starkweather v. Shaffer*, 262 Or. 198, 497 P.2d 358 (1972) (*en banc*), the Oregon Supreme Court was presented with this argument in a case where, although the client agreed to list his property, a writing was not signed until the agent bought the property from the seller. The court rejected the real estate agent's argument that the lack of a written listing precluded a finding that a fiduciary duty had been established. As the court noted, the purpose of the Oregon statute, which, like the Alaska Statutes, required a written listing, was not to relieve agents of their fiduciary obligations, but rather to protect the public from the fraudulent acts of dishonest agents. The court found that:

> . . . .
> (8) an agreement authorizing or employing an agent or broker to sell or purchase real estate for compensation or commission; however, if the note or memorandum of the agreement is in writing, subscribed by the party to be charged or by his lawfully authorized agent, contains a description of the property sufficient for identification, authorizes or employs the agent or broker named in it to sell the property, and expresses with reasonable certainty the amount of the commission or compensation to be paid the agent or broker, the agreement of authorization or employment is not unenforceable for failure to state a consideration;

A fiduciary relationship exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing the confidence.

. . . .

> If, as the defendant contends, no fiduciary relationship existed . . . the agent could make whatever misrepresentations he desired, [and] withhold any information he should disclose, . . . as long as he did so before the listing agreement was signed. Under these circumstances the defendant would be able to use the statute to perpetrate a fraud.

497 P.2d at 361 (citation omitted).

We agree with this reasoning and hold that despite the absence of a written listing, a fiduciary duty was established between Black and Dahl.

Appellants next argue that even if a fiducial duty was established, the duty was not breached by Black. Appellants thus challenge the trial court's findings of fact and conclusions of law which relate to breach of duty.

The nature of the fiduciary duty owed by a real estate agent to client has been delineated by the Washington Supreme Court:

> [F]rom this agency relationship springs the duty and the obligation upon the part of the listing broker, as well as on the part of his subagents, to exercise the utmost good faith and fidelity toward his principal, the seller, in all matters falling within the scope of his employment.

**6.** *See Valkama v. Harris*, 575 P.2d 789, 792 (Alaska 1978).

**7.** *See* Restatement (Second) of Agency § 414(3), Comment d, Illustration 2 (1958). That section discusses the use of the Statute of Frauds as a defense. The illustration states:

> A, a real estate broker, orally agrees with P, in consideration of a commission of five per cent. [sic], to use his best efforts to sell Blackacre. A statute provides that a promise to pay commission to an agent to sell land is unenforceable unless a memorandum has been signed by the promisor. A makes no effort to sell Blackacre. A is subject to liability to P.

Furthermore, there flows from this agency relationship and its accompanying obligation of utmost fidelity and good faith, the legal, ethical, and moral responsibility on the part of the listing broker, as well as his subagents, to exercise reasonable care, skill, and judgment in securing for the principal the best bargain possible; to scrupulously avoid representing any interest antagonistic to that of the principal in transactions involving the principal's listed property, or otherwise self-dealing with that property, without the explicit and fully informed consent of the principal; and to make, in all instances, a full, fair, and timely disclosure to the principal of all facts within the knowledge or coming to the attention of the broker or his subagents which are, or may be, material in connection with the matter for which the broker is employed, and which might affect the principal's rights and interests or influence his actions.

*Mersky v. Multiple Listing Bureau of Olympic, Inc.*, 73 Wash.2d 225, 437 P.2d 897, 899 (1968) (citations omitted).

 The court's findings here amply demonstrate a breach of these obligations, and as appellants concede, we will not overturn a trial court's findings of fact unless they are clearly erroneous.[8] A finding is clearly erroneous only when we are left with "a definite and firm conviction on the entire record that a mistake has been made." *United States v. RCA Alaska Communications, Inc.*, 597 P.2d 489, 512, 513 n.2 (on rehearing) (Alaska 1979). In this case the trial court necessarily chose between conflicting testimony, and our careful re-

view of the record fails to convince us that its findings were clearly erroneous.[9]

 Appellants additionally dispute the court's third conclusion of law that Black was negligent in failing to pursue the sale with due diligence and that this constituted a breach of his fiduciary duty to Dahl. Appellants' failure to establish clear error with respect to any of the findings upon which this conclusion was based is fatal to this argument. We hold that in light of the high standard of care owed by real estate agent to client, *Mersky v. Multiple Listing*, 437 P.2d at 899, and the lower court's findings of fact, the trial court's conclusion of law was correct.

### II

Appellants next claim the court erred in admitting into evidence an unsigned copy of an agreement which provides that an unnamed second party shall pay the first party, Alaska Marketing and Management, Inc. (Patton's company), the sum of $40,000 for services rendered prior to the signing of the Illiamna Lake Lodge lease, as marketing and management consultant.

 The parties disagree as to whether the document, Exhibit 6, comes within the so-called best evidence rule. That rule requires a party seeking to prove the terms of a writing to produce the original if the terms are material, unless the document is "shown to be unavailable for some reason other than the serious fault of the proponent." *Davis v. McCall*, 568 P.2d 956, 959 (Alaska 1977), *quoting* E. Cleary, McCor-

---

**8.** Rule 52(a), Alaska R.Civ.P., provides in part: Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses.

**9.** At oral argument appellants conceded that issues of credibility are properly determined by the trier of fact. This concession disposes of appellants' argument that the court abused its discretion in finding that Black's "demeanor, his manner in answering questions, his partial admissions that under cross-examination developed into full admissions, his apparently selec-

tive memory ... as well as ... internal inconsistency" detracted from Black's credibility.

Likewise, this concession leads to our rejection of appellants' contention that the court was prejudiced against Black to a degree requiring disqualification. Failure to demonstrate not only that incorrect rulings were reached, but, moreover, that such rulings were reached as a consequence of "personal bias ... developed from a nonjudicial source" defeats this argument. *State v. City of Anchorage*, 513 P.2d 1104, 1112 (Alaska 1973).

mick's Law of Evidence § 230, at 560 (2d ed. 1972).[10]

 Even assuming that Exhibit 6 was admitted in contravention of the rule, the error was harmless and does not require reversal. The only provision of Exhibit 6 disputed by the parties is that specifying consulting services as the foundation of the $40,000 payment. There is no question but that Prichard and Sears agreed to pay $40,000 to obtain the lease, as Black admitted this and Prichard and Sears confirmed it. Whether there was an attempt made to funnel this money to Patton's company in the guise of a consulting payment, instead of to Sjoden, as Exhibit 6 suggests, is irrelevant to the question of the appellants' liability. Dahl argued at trial that Exhibit 6 showed Black's motive to delay the sale. However, such a motive is not necessary to a decision that Black breached his duty to Dahl with resulting injury to Dahl. Black's actions prevented Dahl from receiving the money Prichard and Sears agreed to pay for the lease, and appellants are therefore liable to Dahl for the damages he suffered. Any error committed in the admission of Exhibit 6 is thus harmless.[11]

10. Trial was held prior to the effective date of the Alaska Rules of Evidence, which alter the common law rules in this area. *See* Rules 1001–1004, Alaska R.Evid.

11. Appellants have additionally argued that Exhibit 6 was inadmissible both because it was not properly authenticated and because it did not fall within the business record exception of former Rule 44(a)(1), Alaska R.Civ.P.

Appellants did not specifically object to the admission of the exhibit on the ground that it was unauthenticated at trial. Assuming, however, that counsel's statement that "it [the exhibit] doesn't have signatures, it doesn't have insertion of parties, it's just a blank really" was sufficient to preserve the objection, we note that "where the document lacks a signature, no rule of evidence prevents the proof of its execution in some other way." 7 J. Wigmore, Evidence § 2134, at 719–20 (Chadbourn rev.ed. 1978). Here the holder of the note is identified as Alaska Marketing and Management, Inc., the first party. Although the second party is unnamed and the copy unsigned, Sears testified that he saw his partner, Prichard, execute the original document. The exhibit was identified as Sears' copy of the original document signed

 Having found no error in the proceedings below requiring reversal, the judgment is AFFIRMED.[12]

COMPTON, J., not participating.

at the closing of the deal. Under these circumstances we find that Exhibit 6 was properly authenticated.

Appellants' argument with respect to former Rule 44(a)(1) was neither raised before the trial court nor included in appellants' statement of points on appeal. We therefore decline to consider it here. *See Saxton v. Splettstoezer,* 557 P.2d 1126, 1127 (Alaska 1977) and cases cited therein.

12. Appellants have claimed that the assessment of damages was incorrect, but have failed to explain their contention or cite any authority in its support and have thus waived the argument on appeal. *L. E. Spitzer Co., Inc. v. Barron,* 581 P.2d 213, 218 (Alaska 1978). We find no merit in appellants' second claim with regard to damages, which goes to the assessment of punitive damages against Black. Having found no error in the trial court's conclusion that Black delayed the sale with knowledge of the harm to Dahl that would result, we do not find that the court abused its discretion in awarding punitive damages. *Haskins v. Shelden,* 558 P.2d 487, 493–94 (Alaska 1976).